UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
RUDY COLON, individually and on behalf of                   :
others similarly situated,                                  :
                                      Plaintiffs,           :          12 Civ. 3788 (JPO)
                                                            :
                    -v-                                     :          OPINION AND ORDER
                                                            :
MAJOR PERRY STREET CORP., et al.,                           :
                                      Defendants.           :
                                                            :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

        Plaintiff Rudy Colon, individually and on behalf of others similarly situated, alleges that

Defendants violated the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL")

by, among other things, failing to pay employees in accordance with minimum wage and overtime

laws.  On July 2, 2013, the Court granted in part Plaintiffs' Motion for Conditional Certification

of a Collective Action under FLSA and ordered the parties to submit a revised Notice of

Pendency.[1]  (Dkt. No. 31.)

        Plaintiffs believe that some potential members of the FLSA collective action may be

undocumented workers.  While the parties were drafting a Notice of Pendency, the Second

Circuit issued a decision limiting the discretion of the National Labor Relations Board ("NLRB"

or "Board") to award certain damages to undocumented workers under a different law: the

National Labor Relations Act ("NLRA").  *Palma v. N.L.R.B.*, 723 F.3d 176 (2d Cir. July 10,

2013).  The parties disagree about *Palma*'s impact on FLSA cases.  The underlying question of

_____

[1] The FLSA collective action addresses Plaintiffs' federal minimum wage and overtime claims
only; it does not address other claims included in the Complaint.  (Dkt. No. 1 ("Complaint") at
20.)

whether undocumented workers may recover damages under FLSA controls two disputed issues in this case: first, what language, if any, should the Notice of Pendency contain about the participation of undocumented workers; and second, what discovery, if any, should be allowed into the citizenship status of potential plaintiffs.

For the reasons that follow, this Court holds that undocumented workers continue to be eligible to recover unpaid minimum wage and overtime wages under FLSA. Accordingly, the Court approves a Notice of Pendency including Plaintiffs' latest proposed language,[2] and denies Defendants' Motion for Discovery Regarding Immigration Status.

## I.   Discussion

This is a tale of two labor laws and the divergent paths that they have taken in light of shifting immigration policy. In FLSA actions, such as this case, the courts have traditionally permitted undocumented workers to recover unpaid minimum wage and overtime pay for work that has already been performed ("retrospective backpay"). In contrast, in NLRA actions the courts have not permitted undocumented workers to recover post-termination backpay for work that was not actually performed, but that would have been performed but for an employer action—such as retaliatory termination of an employee—that violated statutorily prescribed labor rights. The two statutes provide distinctive rights and remedies. Despite employers' repeated attempts to import the NLRA's limitations into FLSA cases, courts have consistently and overwhelmingly distinguished NLRA precedents from FLSA doctrine. Defendants now argue that *Palma*, the Second Circuit's latest NLRA decision, represents a "sea change" in the established practice. (Dkt. No. 36 at 2.)

---

[2] The language is included, *infra*, in Section II.A.

### A.      The Fair Labor Standards Act

Defendants' position is first considered in light of the text, legislative history, and agency interpretation of FLSA.

### 1.      Statutory Text

In evaluating the proper scope of FLSA's protections, the plain text of the statute is a critical starting point.  The statute provides, without exception, that "[a]ny employer who violates the [minimum wage or overtime] provisions . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b); *see also Patel v. Quality Inn S.*, 846 F.2d 700, 705 (11th Cir. 1988) (quoting § 216(b) to argue that "[n]othing in the act purports to limit the remedy available to any of the workers it covers").

The term "employee" is broadly defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).  FLSA provides several exceptions to this definition, but undocumented workers are not among the exceptions.  Given FLSA's broad definition and express exceptions, the Supreme Court has articulated skepticism toward finding additional exceptions by implication:

> The Act declared its purposes in bold and sweeping terms. Breadth of coverage was vital to its mission. Its scope was stated in terms of substantial universality . . . . Where exceptions were made, they were narrow and specific. It included as employees 'any individual employed by an employer' . . . . It devoted § 13 to listing *exemptions of specific classes of employees*. . . .  Such specificity in stating exemptions strengthens the implication that employees not thus exempted . . . remain within the Act.

*Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 516-17 (1950) (internal citations omitted); *see also Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27, 27-28 (1987) ("Detailed and particular FLSA exemptions cannot be enlarged by implication . . . ."); *Patel*, 846 F.2d at 702-03 (citing additional Supreme Court precedents). Contemporary courts, including those ruling after *Palma*, have continued to conclude that "FLSA's sweeping definitions of 'employer' and 'employee' unambiguously encompass unauthorized aliens." *Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 934 (8th Cir. July 29, 2013).

This plain reading of FLSA is supported when FLSA is read *in pari materia* with the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3445. IRCA does not textually repeal FLSA's protection of undocumented workers but rather presumes that FLSA will apply to such workers. "In section 111(d) [of IRCA] Congress specifically authorized the appropriation of additional funds for increased FLSA enforcement on behalf of undocumented aliens. . . . This provision would make little sense if Congress had intended the IRCA to repeal the FLSA's coverage of undocumented aliens." [3] *Patel*, 846 F.2d at 704. "Presuming . . . that the IRCA impliedly exempts unauthorized aliens from the protections of the FLSA would render this section 'mere surplusage.' . . . A reading [of FLSA] that turns an entire subsection [of IRCA] into a meaningless aside 'is inadmissible, unless the words require it.'" *Lucas*, 721 F.3d at 937 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803)).

---

[3] Section 111(d) of IRCA states:

> There are authorized to be appropriated, in addition to such sums as may be available for such purposes, such sums as may be necessary to the Department of Labor for enforcement activities of the Wage and Hour Division . . . in order to deter the employment of unauthorized aliens and remove the economic incentive for employers to exploit and use such aliens.

Pub. L. No. 99–603, § 111(d), 100 Stat. 3357, 3381 (1986).

2.      **Legislative History**

The legislative history of both FLSA and IRCA support the plain reading that FLSA encompasses undocumented workers.  FLSA was part of social legislation "[p]assed in the depths of the Great Depression . . . to ensure a 'fair day's pay for a fair day's work.'"  *Stein v. Guardsmark, LLC*, 12 Civ. 4739 (JPO), 2013 WL 3809463 at *1 (S.D.N.Y. July 23, 2013) (citing S. Rep. No. 884-2475 at 2 (1937); 81 Cong. Rec. 4983 (1937)).  "It requires covered employers to pay their employees a statutorily prescribed minimum wage and prohibits employers from requiring their employees to work more than forty hours per week unless the employees are compensated at one and one half times their regular hourly rate."  *Patel*, 846 F.2d at 702 (citing 29 U.S.C. §§ 206, 207(a)(1)).  One court cited Senator Black's statement during floor debates that FLSA's "definition of employee . . . is the broadest definition that has ever been included in any one act."  *Id.* at 702 (citing 81 Cong. Rec. 7656-57 (1937)).

Additionally, "IRCA's legislative history strongly suggests that Congress believed that undocumented aliens would continue to be protected by the FLSA."  *Id.* at 704.  The House Education and Labor Committee reported that:

> [T]he committee does not intend that any provision of this Act would limit the powers of State or Federal labor standards agencies such as the . . . Wage and Hour Division of the Department of Labor . . . to remedy unfair practices committed against undocumented employees . . . . To do otherwise would be counter-productive of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment.

H.R. Rep. No. 99-682(II), at 8-9 (1986); *see also* H.R. Rep. No. 99-682(I) (1986), at 58 ("It is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law . . . .").  The Eighth Circuit cited this Report in a post-*Palma* decision noting that "[w]hen Congress passed the IRCA, at

5

least the authors of this report expected the FLSA would continue to protect unauthorized aliens from substandard working conditions and wages." *Lucas*, 721 F.3d at 937.  Thus, the legislative histories of both FLSA and IRCA support the textual interpretation described above.

### 3.      Agency Interpretation

The DOL, the agency charged with interpreting and implementing FLSA, has understood FLSA to apply to undocumented workers.  *See Lucas*, 721 F.3d at 935-36 ("The Department of Labor's position that the FLSA applies to aliens without employment authorization is longstanding and consistent.").  "To the extent there is any statutory ambiguity" regarding FLSA's coverage, the DOL's "position is persuasive and merits *Skidmore* deference." [4]  *Id.* at 936; *see also Patel*, 846 F.2d at 703 ("As the agency charged with implementing the act, however, the Department's interpretation is entitled to considerable deference.").  The DOL first applied FLSA to "alien" workers in 1942, just four years after the act was passed.  *Patel*, 846 F.2d at 703 ("[DOL] opined that alien prisoners of war were covered by [FLSA] and therefore were entitled to be paid the minimum wage.")  For the last sixty years, the DOL has consistently taken the position that FLSA coverage extends to undocumented workers.

> In the Secretary [of Labor]'s amicus brief . . . the Secretary explains that applying the FLSA to unauthorized aliens is essential to achieving the purposes of the FLSA to protect workers from substandard working conditions, to reduce unfair competition for law-abiding employers, and to spread work and thereby reduce unemployment by requiring employers to pay overtime compensation.

---

[4] As the Court noted in *Skidmore*, "[w]e consider that the rulings, interpretations and opinions of the Administrator under [an] Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

*Lucas*, 721 F.3d at 936 (internal quotations omitted).  To the extent that any statutory ambiguity remains regarding FLSA, courts should defer to the Secretary of Labor's "specialized experience and broader investigations and information."  *Id.* at 936 (quoting *Skidmore*, 323 U.S. at 139).

## B.   Comparing FLSA and NLRA Precedents

The statutory text, legislative history, and DOL interpretations described above support the conclusion that FLSA protects undocumented workers.  Defendants have not challenged that reading of FLSA itself.  However, Defendants have suggested that FLSA cases should incorporate restrictive doctrines from another body of law: the NLRA.  While Defendants acknowledge that FLSA and the NLRA have traditionally been treated differently, they argue that *Palma* warrants reconsideration of that practice.  In light of Defendants' arguments, the Court now reviews the bases for distinguishing FLSA cases from NLRA cases.

The Court begins by placing NLRA cases, FLSA cases, and immigration law developments into historical context.  Next, the Court examines potential bases for maintaining this distinction.

### 1.   Historical Overview of NLRA Cases

In three NLRA cases, *Sure-Tan*, *Hoffman*, and *Palma*, the Supreme Court and Second Circuit have curtailed the NLRB's remedial discretion based on tension between the NLRA and national immigration policy.

When the NLRA and FLSA were enacted in the 1930s, the Great Depression, rather than immigration concerns, drove workplace policy.  In later decades, however, immigration policy would weigh upon the interpretation of these labor laws.  In 1984, the Supreme Court considered the NLRA remedies available to undocumented workers in *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883 (1984).  The Court ruled that awarding post-termination backpay to undocumented workers under the NLRA impermissibly conflicted with the immigration objectives of the Immigration

and Naturalization Act ("INA").  The backpay award thus exceeded the NLRB's remedial

authority.  *Id.* at 903 ("In devising remedies for unfair labor practices, the Board is obliged to

take into account . . . the objective of deterring unauthorized immigration . . . .").

Two years after *Sure-Tan*, Congress passed IRCA, amending the INA and clarifying an

immigration policy focused on employment as "the magnet that attracts aliens here illegally."

H.R. Rep. No. 99-682(I), at 46 (1986).  The Supreme Court has never considered IRCA's

possible impact on FLSA damages—the question in this case.  However, soon after IRCA's

passage, two courts of appeals applied FLSA to undocumented workers despite the concerns

articulated in *Sure-Tan*.  *See Patel*, 846 F.2d 700 (distinguishing *Sure-Tan* and reconciling FLSA

with IRCA); *In re Reyes*, 814 F.2d 168 (5th Cir. 1987) (precluding discovery into immigration

status as irrelevant to FLSA).

The Supreme Court then considered IRCA's impact on the NLRA in *Hoffman Plastic*

*Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137 (2002).  *Hoffman* involved an undocumented worker

who was hired, in violation of IRCA, after submitting false documents, and was later fired, in

violation of the NLRA, for labor-organizing activities.  The Supreme Court held that the NLRB

lacks discretion to "award[] reinstatement with backpay to employees who . . . committed serious

criminal acts," including the fraudulent violation of IRCA committed by the employee in

*Hoffman*.  *Id.* at 143.  However, lower courts did not interpret *Hoffman* as applying to FLSA

cases; courts continued to award backpay to undocumented workers under FLSA, but not under

the NLRA.  *See, e.g.*, *Madeira v. Affordable Hous. Found.*, 469 F.3d 219, 243 & n.23 (2d Cir.

2006) (listing "courts [that] have concluded, even after *Hoffman Plastic,* that IRCA does not

preclude . . . FLSA awards."); *Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 400-01, 401 n.11

(E.D.N.Y. 2013) (listing courts that award FLSA damages to undocumented workers and

reporting that "only one district court decision has denied backpay to an undocumented worker post-*Hoffman*").[5]

The Second Circuit thus decided *Palma* against a backdrop of nearly universal differentiation between NLRA and FLSA cases.  *Palma* did not upset the settled reading of FLSA.  To the contrary, the facts of *Palma* lie within *Hoffman*'s rationale for restricting post-termination backpay:

> Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies.  Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations.

*Hoffman,* 535 U.S. at 148.[6]  *Hoffman* reflects the first hypothetical situation, where the employee "tenders fraudulent identification."  *Palma* presents the second hypothetical situation, where the employer "knowingly hires . . . in direct contradiction of its IRCA obligations."  *Palma* technically extends *Hoffman* to cases where an employer knowingly hires an undocumented

---

[5] In *Renteria v. Italia Foods, Inc.*, 2003 WL 21995190 (N.D. Ill. Aug. 21, 2003), undocumented workers sued an employer for minimum wage and overtime pay violations, and for retaliatory discharge, among other claims.  On the retaliation claim, the court allowed compensatory damages but not post-termination backpay.  On the minimum wage and overtime claim, however, the court found no problem with awarding retrospective backpay, and did not even address plaintiffs' immigration status in reviewing that award.  Therefore, every court to consider the question has held that FLSA permits undocumented workers to recover damages for minimum wage and overtime pay violations.

[6] This language was also cited in *Madeira*, which recognized that the Supreme Court was only "[c]onfronting the former circumstance in *Hoffman Plastic*."  469 F.3d at 235.

worker.  But this extension necessarily follows from *Hoffman*'s original logic.[7]  Furthermore, since the NLRB has already interpreted *Hoffman* as applying under either of the hypothetical situations described above, *Palma* merely adopted the NLRB's interpretation of its own authority.  *See Palma*, 723 F.3d at 180 ("[T]he Board stated that *Hoffman Plastic*'s holding is categorically worded with no distinction based on the identity of the IRCA violator . . . .") (internal quotations omitted).

Accordingly, *Palma* has not unsettled the post-*Hoffman* consensus:  district and circuit courts continue to recognize that FLSA, in contrast to the NLRA, permits undocumented workers to recover backpay.  *See Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927 (8th Cir. July 29, 2013) (distinguishing FLSA cases from NLRA cases without addressing *Palma*); *Alcoser v. A Spice Route Inc.*, 12 Civ. 2106 (HB), 2013 WL 5309496, at *1 (S.D.N.Y. Sept. 19, 2013) (distinguishing *Palma* because "multiple courts have concluded that backpay awards under the FLSA stand on starkly different footing"); *Marquez v. Erenler, Inc.*, 12 Civ. 8580 (ALC) (MHD), 2013 WL 5348457, at *1 (S.D.N.Y. Sept. 20, 2013) (noting that *Palma*, like *Hoffman*, "addressed only back pay for terminated employees under the [NLRA]").  This motion, therefore, must be decided in light of the continuing consensus, which distinguishes FLSA cases on the bases described below.

### 2.       NLRA Remedies and FLSA Remedies

One basis for distinguishing NLRA cases from FLSA cases is the difference between the statutes' remedial schemes.  When unfair labor practices occur in violation of the NLRA, the NLRB, an administrative body specially tasked with the enforcement of that Act, exercises

---

[7] In fact, more than half of the language in the section of *Palma* that discussed "*Hoffman Plastic*, IRCA, and Backpay" was quoted directly from *Hoffman*.

"especially broad discretion in choosing an appropriate remedy."  *Hoffman*, 535 U.S. at 153.

Section 10(c) of the NLRA states that upon finding an employer violation, the NLRB should

issue "an order requiring such person to cease and desist from such unfair labor practice, and to

take such affirmative action including reinstatement of employees with or without back pay, as

will effectuate the policies of this subchapter." 29 U.S.C. § 160(c).  The *Sure-Tan* Court noted

that:

> Under § 10(c), the Board's authority to remedy unfair labor
> practices is expressly limited by the requirement that its orders
> "effectuate the policies of the Act." . . . [T]his rather vague
> statutory command obviously permits the Board broad discretion
> . . . . [although] a proposed remedy [must] be tailored to the unfair
> labor practice it is intended to redress.

467 U.S. at 900; s*ee also id.* at 898-99 ("The Court has repeatedly interpreted this statutory

command as vesting in the Board the primary responsibility and broad discretion to devise

remedies that effectuate the policies of the Act, subject only to limited judicial review.");

*N.L.R.B. v. Domsey Trading Corp.*, 636 F.3d 33, 36 (2d Cir. 2011) (noting that "the Board enjoys

broad discretion in fashioning remedies under the NLRA").

     In NLRA cases, courts have exercised limited review to bring the Board's otherwise

broad remedial discretion in line with federal immigration policy.  *See Hoffman*, 535 U.S. at 149

(holding that an award to an undocumented worker "lies beyond the bounds of the Board's

remedial discretion").  The *Sure-Tan* Court recognized that the NLRA protected undocumented

workers as "employees," but vacated a remedial order due to "statutory limits placed by

Congress on the Board's remedial authority."  *Sure-Tan*, 467 U.S. at 905 n.13.  As the Second

Circuit later recognized, "in *Hoffman Plastic,* the policy conflict [between the NLRA and IRCA]

. . . reduces to a concern about remedies."  *Madeira v. Affordable Hous. Found.*, 469 F.3d 219,

242 (2d Cir. 2006).

In contrast to the NLRA, which grants the NLRB broad remedial discretion, FLSA provides statutorily defined damages, leaving courts without discretion to refashion remedies in light of shifting immigration policy.  The Eleventh Circuit recently affirmed this basis for distinguishing between FLSA and the NLRA:

> [N]o administrative body or court is vested with discretion to fashion an appropriate remedy under the FLSA.  Instead, the Act unequivocally provides that any employer who violates its minimum wage or overtime provisions "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  Unlike the NLRA, there is nothing in the FLSA that would allow us to conclude that undocumented aliens, although protected by the Act, are nevertheless barred from recovering unpaid wages thereunder.

*Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1307 (11th Cir. 2013) (quoting FLSA, 29 U.S.C. § 216(b)).  In other words, "if a plaintiff makes out a[] FLSA case, he is entitled to a[] FLSA remedy, any obstruction or interference with immigration policy notwithstanding. . . . Any remedy for an incompatibility between federal labor and immigration policies will have to come from Congress, not the lower courts."  *Jin-Ming Lin v. Chinatown Rest. Corp.*, 771 F. Supp. 2d 185, 190 (D. Mass. 2011).  FLSA's mandatory language leaves no discretion for courts to alter the statute's remedial scheme based on an employee's immigration status.

In addition to the textual differences, the remedial schemes differ in the number of alternative remedies that exist in addition to backpay.  *Hoffman* was informed by the fact that, apart from backpay, the NLRA provides many alternative remedies which are not available under FLSA.  The *Hoffman* Court proscribed the award of post-termination backpay to undocumented workers but emphasized the availability and adequacy of alternative remedies under the NLRA.  Observing that the NLRB "has already imposed other significant sanctions

against the employer," the Court stressed that "[l]ack of authority to award backpay does not mean that the employer gets off scot-free." [8]  *Hoffman*, 535 U.S. at 152.  *Palma* echoed this consideration.  *Palma v. N.L.R.B.*, 723 F.3d 176, 184 (2d Cir. 2013) ("[T]he *Hoffman Plastic* Court noted that sanctions other than the requirement of backpay are available as deterrents."). FLSA, in contrast, provides very few alternative remedies.  Repeat violators of minimum wage and overtime laws can be charged a $1,100 fine, 29 U.S.C. § 216(e)(2), but retrospective backpay is the primary remedy under FLSA. [9]  Given the design of FLSA's remedial scheme, if backpay were not available, many first-time offenders would "get[] off scot-free," and the purpose of FLSA would not be served.

### 3.    Statutory Approaches Toward Unlawful Activity

A second basis for distinguishing the NLRA from FLSA is that NLRA doctrine is controlled by a statute-specific line of cases limiting the NLRB's remedial discretion where organizing activity dovetails with "serious illegal conduct."  *Hoffman*, 535 U.S. at 143.  These cases have no FLSA equivalents, partly because FLSA remedies are non-discretionary, and partly because the statutes regulate fundamentally different activities.  The NLRA regulates labor organizing—a field of activity in which employee dissatisfaction is collectively expressed, often through civil disobedience. [10]  The NLRA forces employers to compensate workers for engaging

---

[8] Specifically, the *Hoffman* Court noted that the employer in would be ordered to "cease and desist its violations of the NLRA, and . . . conspicuously post a notice to employees setting forth their rights under the NLRA and detailing its prior unfair practices."  535 U.S. at 152. Furthermore, the employer would be "subject to contempt proceedings should it fail to comply with these orders."  *Id.*

[9] *See also* note 14, *infra*, and accompanying text (noting that without backpay, FLSA lacks meaningful remedies that would deter employers from violating its wage and hour provisions).

[10] The Act "provides an institutional framework for employees to aggregate their voices and experience their collective power, to participate in influencing the decisions that affect their

in disruptive activities that are often at odds with the employers' interests; in contrast, FLSA merely forces employers to compensate workers for doing their work.  The employee conduct of working bears less of a threat than the activity of organized protest.  Courts reviewing NLRB awards had to isolate protected dissidence from impermissible forms of protest.  As a result, NLRA jurisprudence developed a focus—lacking under FLSA—on regulating unlawful activity in the workplace.

Since the 1930s, the Supreme Court has regulated the fault line dividing the "collective power" protected by the NLRA from unlawful and unprotected forms of organizing.  In *N.L.R.B. v. Fansteel Metallurgical Corp.*, the Court considered a sit-down strike in which employees were criminally prosecuted after they seized and occupied work premises in violation of local laws. 306 U.S. 240 (1939).  In language repeated in *Hoffman*, the *Fansteel* Court vacated the NLRB's reinstatement remedy:

> We are unable to conclude that Congress intended to compel employers to retain persons in their employ regardless of their unlawful conduct, —to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property, which they would not have enjoyed had they remained at work.

*Fansteel*, 306 U.S. at 255, *quoted in Hoffman*, 535 U.S. at 143.

Three years later, the Court extended *Fansteel* by vacating the NLRB's reinstatement and backpay award for "five employees whose strike on shipboard had amounted to a [revolt and] mutiny in violation of federal law."  *Hoffman*, 535 U.S. at 143 (discussing *Southern S.S. Co. v. N.L.R.B.*, 316 U.S. 31 (1942)).  The *Fansteel* doctrine was further extended to restrict NLRB

---

industrial lives, and to enhance their working conditions and pride and dignity on-the-job."  Karl E. Klare, *Traditional Labor Law Scholarship and the Crisis of Collective Bargaining Law: A Reply to Professor Finkin*, 44 Md. L. Rev. 731, 743 (1985).

remedies, particularly reinstatement and post-termination backpay, where employees "engaged in serious misconduct . . . such as threatening to kill a supervisor or stealing from an employer." *Hoffman,* 535 U.S. at 146 (internal quotations and citations omitted).  This line of cases curtailed the NLRB's discretion to provide remedies that would reward and promote unlawful forms of organized protest.  *Id.* at 146-47.

The *Hoffman* Court placed its decision squarely within this line of cases.  Because "[u]nder the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies," the Court concluded that *Hoffman* "is controlled by the *Southern S.S. Co.* line of cases."  *Id.* at 146, 148.  FLSA contains no analog to *Fansteel* or *Southern S.S. Co* and is therefore distinguishable. Since the 1930s, courts have expressed discomfort with including illegal activity within the ambit of the NLRA's broad protections, but they have expressed no similar concern with enforcing FLSA's minimum wage and overtime protections.[11]

### 4.    Distinctions in Backpay

A third basis for distinguishing FLSA from the NLRA lies in the distinction between the retrospective backpay sought under FLSA and the post-termination backpay awarded under the NLRA.  This simple difference explains why NLRA backpay conflicts with IRCA while FLSA backpay does not.  Post-termination backpay under the NLRA requires the legal fiction that the employee was "available for work" and would have been working but for the unfair termination. *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 889 (1984).  However, the Court has held that

---

[11] Minimum wage and overtime violations are not authorized by IRCA or any other statute.  *See* § 111(d), *supra* note 3; *cf. Madeira v. Affordable Hous. Found.*, 469 F.3d 219, 236 (2d Cir. 2006) (concluding, in a personal injury case, that "neither IRCA nor any other law authorized, much less required, any appellant to inflict disabling physical injury on [undocumented workers]").

undocumented workers cannot be found to be available for work.  *Id.* at 903 ("[I]n computing backpay, the [undocumented] employees must be deemed "unavailable" for work . . . during any period when they were not lawfully entitled to be present and employed in the United States."). Therefore, under the NLRA, post-termination backpay cannot be awarded to undocumented workers.

The Second Circuit has explained why FLSA is different:

> [A]n order requiring an employer to pay his undocumented workers the minimum wages . . . for labor actually and already performed . . . does not itself condone that [immigration] violation or continue it.  It merely ensures that the employer does not take advantage of the violation by availing himself of the benefit of undocumented workers' past labor without paying for it in accordance with minimum FLSA standards.

*Madeira v. Affordable Hous. Found.*, 469 F.3d 219, 243 (2d Cir. 2006).  In *Madeira*, the Second Circuit constructed "a spectrum of remedies potentially available to undocumented workers" to determine which remedies impermissibly conflicted with IRCA.  *Id.* at 242.   On that spectrum, FLSA backpay was found to be the least likely to conflict with IRCA when awarded to undocumented workers. [12]  *Id.* at 242-43.  With this characterization, the Second Circuit implicitly held that undocumented workers are entitled to FLSA backpay despite IRCA's impact on the NLRA.

The Second Circuit later distinguished *Palma* from *Madeira*, but did not disturb *Madeira*'s characterization of FLSA backpay as an unproblematic remedy.  *See Palma*, 723 F.3d

---

[12] At one end of the spectrum, the Second Circuit, citing *Sure-Tan*, identified reinstatement under the NLRA as "in plain conflict with federal immigration policy."  *Madeira*, 469 F.3d at 242-43. "At the other end of the spectrum are orders that do not require, or even presume, a continuing violation of IRCA, for example, an order requiring an employer to pay his undocumented workers the minimum wages prescribed by [FLSA], for labor actually and already performed." *Id.* at 243.  The Circuit held that because the remedy in *Madeira* was closer to the FLSA remedy than the NLRA remedy, it was a permissible award for an undocumented worker.

at 184 ("IRCA's focus is on violations of the immigration laws, not on workplace safety.").  In

fact, "[m]any courts have stated that the holding in *Hoffman* is limited to precluding relief for

work not yet performed, as opposed to work already performed."  *Solis v. SCA Rest. Corp.*, 938

F. Supp. 2d 380, 400 (E.D.N.Y. 2013) (cataloging such cases); *e.g. Solis v. Cindy's Total Care,*

*Inc.*, 10 Civ. 7242 (PAE), 2011 WL 6013844, at *2 (S.D.N.Y. 2011) ("[I]n *Hoffman,* the

backpay award . . . pertained only to a period of time following the subject employees'

termination.  In the present case, by contrast, the [FLSA] backpay award sought by the Secretary

is exclusively for work that *was* performed."); *Zeng Liu v. Donna Karan Int'l, Inc.*, 00 Civ. 4221

(WK), 207 F. Supp. 2d 191, 192 (S.D.N.Y. 2002) ("Courts have distinguished between awards of

post-termination back pay for work not actually performed and awards of unpaid wages pursuant

to [FLSA].") (formatting altered).  Post-*Palma*, the Eighth Circuit cited *Madeira* rather than

*Palma* when considering the validity of undocumented workers' FLSA backpay awards.  *Lucas*

*v. Jerusalem Cafe, LLC*, 721 F.3d 927, 935 (8th Cir. July 29, 2013).

### 5.   The Statutes' Relationship with IRCA

Finally, the three preceding bases for distinguishing the NLRA from FLSA are further

supported by an analysis of the statutes' different effects on immigration policy.  Several courts

have observed that awarding FLSA backpay to undocumented workers supports the policy goals

expressed in IRCA.  The Eighth Circuit recently described the alignment of the two statutes:

> Congress's purposes in enacting the FLSA and the IRCA are in
> harmony.  The IRCA unambiguously prohibits hiring unauthorized
> aliens, and the FLSA unambiguously requires that any
> unauthorized aliens—hired in violation of federal immigration
> law—be paid minimum and overtime wages.  The IRCA and
> FLSA together promote dignified employment conditions for those
> working in this country, regardless of immigration status, while
> firmly discouraging the employment of individuals who lack work
> authorization.

*Lucas*, 721 F.3d at 936.  The Eleventh Circuit recently reaffirmed a pre-*Hoffman* precedent that explains the economic incentives behind this harmonious arrangement:

> FLSA's coverage of undocumented aliens goes hand in hand with the policies behind the IRCA.  Congress enacted the IRCA to reduce illegal immigration by eliminating employers' economic incentive to hire undocumented aliens. . . . The FLSA's coverage of undocumented workers . . . offsets what is perhaps the most attractive feature of such workers—their willingness to work for less than the minimum wage.  If the FLSA did not cover undocumented aliens, employers would have an *incentive* to hire them.  Employers might find it economically advantageous to hire and underpay undocumented workers and run the risk of sanctions under the IRCA.

*Patel v. Quality Inn S.*, 846 F.2d 700, 704 (11th Cir. 1988); *see also Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1306 (11th Cir. 2013) ("*Hoffman* is not clearly on point and therefore did not overrule *Quality Inn*.")).  District courts awarding retrospective backpay under FLSA have echoed that logic.  *Flores v. Amigon*, 233 F. Supp. 2d 462, 464 (E.D.N.Y. 2002) ("[E]nforcing the FLSA's provisions requiring employers to pay proper wages to undocumented aliens when the work has been performed actually furthers the goal of the IRCA . . . . If employers know that they . . . will also be required to pay them at the same rates . . . there are virtually no incentives left for an employer to hire an undocumented alien in the first instance."); *Solis v. Cindy's Total Care*, 2011 WL 6013844, at *3 ("[W]here illegal workers are able to vindicate the right to overtime pay conferred by the FLSA, there is no . . . perverse incentive.").

The cost-benefit analysis weighs more heavily in favor of providing remedies for undocumented workers under FLSA than under the NLRA.[13]  On the cost side of the equation,

---

[13] This argument was initially recognized in NLRA cases, but then was overcome by other policy arguments.  *Compare Sure-Tan*, 467 U.S. at 911-912 ("Application of the NLRA helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of

the NLRB can impose costs on employers that hire undocumented workers through many remedies other than backpay.[14]  In contrast, retrospective backpay is the primary remedy for unpaid minimum wage and overtime compensation under FLSA.  The only source of deterrence and punishment that is not tied to backpay under FLSA is a $1,100 fine for repeat or willful violations. 29 U.S.C. § 216(e)(2).[15]

On the benefits side of the equation, the underpayment of undocumented workers represents a concrete benefit to employers that begins to accrue immediately once the worker is hired.  In contrast, the employer incentive for hiring undocumented workers based on the denial of future post-termination backpay under the NLRA is far more attenuated.  The incentive under the NLRA must be discounted by the likelihood that an employee would engage in protected labor activities, be terminated as a result, and fail to mitigate.[16]  At the moment of hiring, the

---

employment.") *and Hoffman*, 535 U.S. at 155 (Breyer, J., dissenting) ("To *deny* the Board the power to award backpay . . . lowers the cost to the employer of an initial labor law violation . . . . It thereby increases the employer's incentive to find and to hire illegal-alien employees."), *with Palma*, 723 F.3d at 184 ("although petitioners have argued that awards of backpay are needed in order to discourage employers from hiring undocumented workers, the *Hoffman Plastic* Court noted that sanctions other than the requirement of backpay are available as deterrents.").  In *Madeira*, the Second Circuit explained that "[t]he *Hoffman Plastic* majority did not explicitly reject the general premise of the . . . incentive argument.  Rather, it identified other factors in the case that tipped the . . . balance." 469 F.3d at 246; *see also id.* at 255 ("*Hoffman Plastic* was a fact-specific, policy-driven decision . . . .") (Walker, J., concurring).

[14] The *Hoffman* cases noted that alternative remedies besides reinstatement and post-termination backpay are available and sufficient to deter NLRA violations.  *See* Section I.B.2, *supra*.

[15] Liquidated damages are also available, but the amount of liquidated damages is pegged to the calculation of backpay.  29 U.S.C. § 216(b) ("Any employer who violates the provisions [on minimum wage] or [overtime compensation] of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, *and in an additional equal amount as liquidated damages*.") (emphasis added).

[16] Employees must mitigate backpay damages under the NLRA.  *See Hoffman*, 535 U.S. at 150.

concrete immediate benefits of under-enforced FLSA violations greatly outweigh the uncertain future benefits of under-enforced NLRA violations.  Therefore, the incentives argument is stronger in the FLSA context than in the NLRA context—employers benefit more from wage violations and, without backpay, they would face far lower costs.  Thus, providing FLSA remedies to undocumented workers is more beneficial to implementing immigration policy than providing NLRA backpay was.

### 6.    Summary

Taken together, the historical divergence of NLRA and FLSA doctrines and the bases for that divergence strongly suggest that NLRA doctrine does not alter the statutory interpretation of FLSA undertaken above.  The statutory analysis of FLSA and a review of the relevant precedents support the conclusion that, despite recent developments under the NLRA, undocumented workers are still entitled to retrospective backpay under FLSA.

## II.    Application to the Notice of Pendency and Discovery Dispute

The holding that FLSA protects undocumented workers controls the outcome of the parties' disputes over the Notice of Pendency and the scope of discovery.

### A.    Notice of Pendency

Based on the foregoing analysis, the Court approves the following proposed language from the Plaintiffs' August 14, 2013 submission:

> Federal law also permits you to join in this lawsuit and share in any recovery regardless of your immigration status.  You will not be asked to disclose whether you are a citizen or have a green card in order to participate in this collective action.

(Dkt. No. 40 at 2 (formatting and punctuation altered).)  This statement accurately reflects FLSA's coverage of employees regardless of immigration status.  FLSA also mandates liquidated damages, "a reasonable attorney's fee . . . , and costs" in the same provision that provides for backpay.[17]  *See also Lamonica*, 711 F.3d 1299 (affirming an award of liquidated damages to an undocumented FLSA plaintiff); *Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380 (E.D.N.Y. 2013) (awarding liquidated damages).  Many of the same statutory and jurisprudential arguments apply to those supplemental remedies, and their potential inclusion in an award does not alter the outcome.

Additionally, Defendants note that some plaintiffs, including the named plaintiff, may allege retaliation and seek reinstatement with post-termination backpay and other relief.  These claims lie outside the collective action; accordingly, they have no effect on the Notice of Pendency and need not be addressed at this time.

### B.    Discovery

Finally, the Court considers the issue of discovery.  Defendants seek discovery into the immigration status of potential plaintiffs in the collective action.[18]  Discovery into a FLSA plaintiff's immigration status is irrelevant and impermissible.  *See In re Reyes*, 814 F.2d 168, 170 (5th Cir. 1987) (describing such discovery as "completely irrelevant to the case before it and

---

[17] "Any employer who violates the [minimum wage or overtime] provisions . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, *and in an additional equal amount as liquidated damages*. . . .  The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow *a reasonable attorney's fee* to be paid by the defendant, *and costs* of the action." 29 U.S.C. § 216(b) (emphasis added).  Where a FLSA violation has occurred, liquidated damages "are the norm." *Renteria v. Italia Foods, Inc.*, 2003 WL 21995190, at *1 (N.D. Ill. 2003) (internal quotations omitted).

[18] Notably, Defendants cite no authority for such discovery in their Motion (Dkt. No. 39 at 6-7).

[seeking] information that could inhibit petitioners in pursuing their rights . . . because of possible collateral wholly unrelated consequences, because of embarrassment and inquiry into their private lives which was not justified, and also because it opened for litigation issues which were not present in the case"); *Zeng Liu v. Donna Karan Int'l, Inc.*, 207 F. Supp. 2d 191, 193 (S.D.N.Y. 2002) ("[S]uch discovery . . . would inhibit plaintiffs in pursuing their rights."); *Flores v. Amigon*, 233 F. Supp. 2d 462, 464 (E.D.N.Y. 2002) ("[D]iscovery into the plaintiffs' immigration status was irrelevant and posed a serious risk of injury to the plaintiffs, outweighing any need for disclosure."). This principle has been applied consistently in FLSA cases before and after *Palma*. *See Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 401 n.11 (E.D.N.Y. 2013) (listing cases "denying discovery of plaintiffs' immigration status in FLSA case[s]"); *Marquez v. Erenler, Inc.*, 12 Civ. 8580 (ALC) (MHD), 2013 WL 5348457 at *1 (S.D.N.Y. Sept. 20, 2013) ("Based on . . . the irrelevance of immigration status to a[] FLSA claim, as well as the chilling effect that such compelled disclosure would have on enforcement of the FLSA, we deny defendants' request for disclosure of immigration status."). Accordingly, Defendants' discovery request is hereby denied. "If it appears at some later juncture that such discovery would be relevant, and more relevant than harmful, [Defendants] may seek leave to renew this request. [19] *Zeng Liu*, 207 F. Supp. 2d 191, 193.

---

[19] If Plaintiffs prevail on retaliation claims and seek post-termination relief, then this Court may have to decide whether immigration status is relevant to the availability of those remedies. That question is not controlled by this Opinion and presents a more difficult question: whether post-termination backpay is available to undocumented workers under FLSA's anti-retaliation provisions. The arguments in the Opinion that focus on textual differences between FLSA and the NLRA would still apply, but the arguments based on the distinction between retrospective and post-termination backpay would not. In any event, a ruling on those issues is premature.

22

**III.    Conclusion**

For the foregoing reasons, Defendants' discovery request is hereby DENIED; and

Plaintiffs' proposed language contained in Section II.A for use in the Notice of Pendency is

hereby APPROVED.

The Clerk of the Court is directed to terminate the motions at docket numbers 39 and 40.

SO ORDERED.

Dated: New York, New York

December 19, 2013

_____

J. PAUL OETKEN

United States District Judge